FILED

2015 FEB -9 PM 12: 21

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FL

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
Ocala Division

United States of America, *ex rel.*
Robert Green and Emily Moore,
    Plaintiffs,

vs.

Thi Tran,
    Defendant.

5: 15-CV-60 OC -41 PRL

**FILED UNDER SEAL**

## COMPLAINT

1.    *Qui tam* Plaintiffs Robert Green and Emily Moore (Relators), through their attorney, brings this Complaint on behalf of the United States and on his and her own behalf, under 31 U.S.C. § 3730 *et seq.* of the Federal False Claims Act.

## I. NATURE OF ACTION

2.    Under the False Claims Act, a private person may bring an action in federal district court for herself and for the United States and may share in any recovery. 31 U.S.C. § 3730(b). That private person is a "relator," and the action that the relator brings is called a qui tam action.

3.    Relators allege that Defendant submitted, or caused to be submitted, false and fraudulent claims for payment to government health care programs. The false claims are premised upon three schemes to defraud the United States Government.

4.    The first scheme alleges Defendant submitted claims for reimbursement for medical procedures he could not have performed. Defendant Tran is the sole physician in his office with three Physician Assistants (P.A.s). When considering the average time involved in



the procedures reported to the Government as performed by Defendant Tran in one year (based on 2012 figures), Relators allege that Defendant could not have done the procedures he claimed.

5.      The second scheme alleges Defendant Tran fraudulently submitted claims to the Government for reimbursement for services he claimed to have performed but, in actuality, were performed by his non-physician assistants.

6.      The third scheme alleges Defendant Tran fraudulently up-coded procedures to recoup more money from the Government than what was allowed. Up-coding occurs when doctors bill less expensive procedures at a higher reimbursement rate. It harms more than the governments fisc. Defendant risked harming patients when he falsified their medical records to make it appear that the patient had a different and more costly diagnosis and procedure than what was performed.

## II. JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 31 U.S.C. §§ 3732(a) and 3730(b). Relators are "original sources" and are otherwise authorized to maintain this action in the name of the United States as contemplated by the Civil False Claims Act, 31 U.S.C. §§ 3729-33. Relators have made voluntary disclosures to the United States Government prior to filing this lawsuit as required by 31 U.S.C. § 3730(b)(2).

8.      The Court has personal jurisdiction over Defendant under 31 U.S.C. § 3732(a), because Defendant is transacting and has transacted business in this District, and because Defendant committed acts within this District that violated 31 U.S.C. § 3729.

9.      Venue is proper in this District under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b) and (c) because Defendant resides and/or transacts business in this District, and because Defendant committed acts within this District that violated 31 U.S.C. § 3729.

## III. THE PARTIES

10.   **Defendant Thi Tran**, DO, NPI 1437117116, specializes in dermatology. His office is in The Villages, Florida. He practices medicine with three P.A.s, and no other physician. In 2012 Medicare reimbursed Defendant for more than $7,777,110 for over 84,305 procedures.

11.   **Plaintiff Relator Dr. Robert Green**, DO, Board Certified Family Practice, Former Clinical Professor Hospital and MSO Leadership. Relator Green has experience with multiple medical practices in the Villages, FL and has participated in health care investigations.

12.   **Plaintiff Relator Emily Moore**, is Certified Professional Coder through American Academy of Professional Coders, Certified Coding Associate through American Health Information Management Association. Former Professor of Medical Coding and Billing Program, Northwest Florida State College.

### A.    STATUTORY AND REGULATORY BACKGROUND

#### 1.    *Medicare*

13.   Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 - 1395ggg, establishes the Health Insurance for the Aged and Disabled Program, popularly known as the Medicare Program. The Secretary of the Department of Health and Human Services ("HHS") administers the Medicare program through the Centers for Medicare & Medicaid Services ("CMS"), a component of HHS.

14.   The Medicare program comprises of four parts. Medicare Parts A, C, and D are not at issue. Medicare Part B, which is at issue here, provides federal government funds to help pay for medically necessary and preventative services performed for Medicare beneficiaries.

15.   Medicare Part B is funded by insurance premiums paid by enrolled Medicare beneficiaries and contributions from the federal treasury. Eligible individuals, who are age 65 or

older, or disabled, may enroll in Part B to obtain benefits in return for payments of monthly premiums as established by HHS. However, payments under the Medicare Program are often made directly to service providers rather than to the patient (the "beneficiary"). This occurs when the provider accepts assignment of the right to payment from the beneficiary. In that case, the provider submits its bill directly to Medicare for payment.

16.     The United States provides reimbursement for Medicare claims through Centers for Medicare & Medicaid Services ("CMS"). CMS, in turn, contracts with private insurance carriers to administer, process, and pay Part B claims from the Federal Supplementary Medical Insurance Trust Fund (the "Part B Trust Fund"). In this capacity, the carriers act on behalf of CMS. At all times, Defendants submitted claims to the Part B Carrier in Florida.

17.     The Medicare Program, through the Part B Carrier, pays a significant portion of every claim. The Medicare beneficiary, or his or her supplemental insurance carrier, is required to pay the balance owed the provider. The beneficiary's payment is sometimes referred to as a "co-pay." Beneficiaries also pay deductibles.

18.     All healthcare providers must comply with applicable statutes, regulations and guidelines in order to be reimbursed by Medicare Part B. A provider has a duty to have knowledge of the statutes, regulations and guidelines regarding coverage for the Medicare services, including, but not limited to, the following:

a. 42 U.S.C. § 1395y(a)(1)(A) (Medicare covers only reasonable and necessary medical services); and
b. 42 U.S.C. § 1320c-5(a)(1) (Providing economical medical services, and then, only when, and to the extent, medically necessary).

19.     The billing requirements applicable to Medicare claims are set forth in Title 42 of the Code of Federal Regulations. As part of these requirements, services rendered by physicians

are subject to reimbursement at the rate specified in the physician fee schedule.

20.     Services rendered by non-physicians, such as physician's assistants and nurse practitioners, are generally subject to a 15% reduction from the amount set forth in the physician fee schedule. 42 C.F.R. §§ 414.52 & 414.56.

21.     Services rendered by non-physicians may only be reimbursed by Medicare at the physician rate if those services meet all of the requirements set forth in 42 C.F.R. § 410.26. Among other things, this regulation provides that the services must be:

a. An integral, although incidental, part of the physician's professional service;

b. Commonly rendered without charge or included in the physician's bill;

c. Of a type that are commonly furnished in physician's offices or clinics; and

d. Furnished by the physician or by auxiliary personnel under the physician's direct supervision.

22.     Pursuant to the "integral, although incidental" requirement, the actual rendition of a professional service by a non-physician may only be reimbursed at the physician rate if the physician expends time on the patient, that is only if *the physician performs an initial service and subsequent services*.

> Such a service or supply could be considered to be incident to when furnished during a course of treatment where the physician performs an initial service and subsequent services of a frequency which reflect his/her active participation in and management of the course of treatment. (However, the direct supervision requirement must still be met with respect to every nonphysician service.) Section 60.1[1]

23.     Pursuant to the "direct supervision" requirement, "the physician must be present in the office suite and *immediately available to furnish assistance and direction throughout the*

---

[1]  CMS Publication 100-2, the Medicare Benefits Policy Manual, Chapter 15, Section 60.1 and 60.3.
http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/bp102c15.pdf

*performance of the procedure.*" 42 C.F.R. §§ 410.26 & 410.32.

> [T]here must have been a direct, personal, professional service furnished by the physician to initiate the course of treatment of which the service being performed by the nonphysician practitioner is an incidental part, and there must be subsequent services by the physician of a frequency that reflects the physician's continuing active participation in and management of the course of treatment. In addition, the physician must be physically present in the same office suite and be immediately available to render assistance if that becomes necessary

> CMS Publication 100-2, the Medicare Benefits Policy Manual, Chapter 15, Section 60.2

24.    In order to receive reimbursement from the Medicare Program, a provider must submit an electronic or hard-copy claim form called the CMS-1500 Form with the following certification:

> SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, CHAMPUS, FECA AND BLACK LUNG)
> I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise permitted by Medicare or CHAMPUS Regulations.
> For services to be considered as 'incident' to a physician's professional services, 1) they must be rendered under the physician's immediate personal supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician's services, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of nonphysicians must be included on the physician's bills.

25.    On a CMS-1500 Form, the provider also must specify, among other things, the procedure(s) for which it is billing Medicare. Providers use the Current Procedural Terminology ("CPT") numeric codes to describe on the CMS-1500 Form the procedures or services they rendered.

### 2.    *The Federal False Claims Act*

26.    The False Claims Act provides, in pertinent part that:

(a) Any person who (1) knowingly presents, or causes to be presented, to an

officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government,

\* \* \*

is liable to the United States Government . . . . (b) For purposes of this section, the terms 'knowing' and 'knowingly' mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate in ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729.

## I. DEFENDANT'S' FRAUDULENT ACTS WHICH VIOLATE THE FEDERAL FALSE CLAIMS ACT

27.     Relators investigated Defendant's medical practice. In addition, through their knowledge of the time required for various procedures they deconstructed Defendant's claims for reimbursement, and compared him to all other providers who filed claims for similar procedures.

28.     Relators used their medical experience and coding knowledge, and analyzed the claimed procedures. The result of Relators' investigation, statistical analysis, and synthesis of data substantiated their conclusion that Defendant claimed more than he was entitled to receive. He did this by falsely claiming to have performed procedures he has not done, by falsely charging at his professional (higher) rate for work done by his non-professional assistants, and falsely charging for more expensive procedures while doing less costly procedures (up-coding). All of these schemes violate the False Claims Act and subject Defendant to liability under the Act.

### A.   False Claims: Insufficient Time to Perform and Supervise 84,000 Procedures

29.   In 2012, Medicare reimbursed Defendant for over 84,305 procedures. [2] For many of these he was among the top ten billers in the country. Exhibit A – "Top Ten" Procedures.

30.   All the procedures took time and some have "typical times", such as the Office Outpatient visit codes. *See*, Pub 100-04, 30.6.15.1 (E). Relators estimated the time that should reasonably have been expended on these codes.

31.   Relators learned that Defendant practiced with three non-physician professional assistant, and without the assistance of another physician.

32.   CMS paid for 425 "evaluation and management" code 99202 which has a "typical time" of 20 minutes.[3] The Medicare payment is 80 percent of the allowed charge after the deductible is met. The non-physician assistants may not be reimbursed at 80% unless Dr. Tran was "immediately available to furnish assistance and direction throughout the performance of the procedure." 42 C.F.R. § 410(a)(2). If he was not immediately available, the assistants would be reimbursed only 68% (85% of 80%) of the allowed amount.

33.   For code 99202 the ratio between average payment and average allowed is 74.6%. Relators estimate Defendant claimed 234 of the 425 procedures at 80% and claimed the balance were performed by a nonphysician where the reimbursement payment was only 68% of the

---

[2]      In addition to their investigation, Relators analyzed and synthesized raw data made available by CMS for 2012. The analysis was made in part by comparing Defendant's claim data to the more than 9 million records containing more than 243 million data from CMS's National Claims History Standard Analytic Files. The data covers calendar year 2012 and contains 100% final-action physician/supplier Part B non-institutional line items for the Medicare fee-for-service population.
        Relators analyzed and synthesized raw data made available from various sources including the above-described file.
http://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier.html as of October 10, 2014.

[3]      http://www.cms.gov/medicare-coverage-database/staticpages/cpt-hcpcs-code-range.aspx?DocType=LCD&DocID=32007&Group=1&RangeStart=99201&RangeEnd=99205

allowed amount. At a "typical time" of 20 minutes per procedure, Relators calculate Defendant's claimed 234 procedures would have taken 78 hours.

34. Similarly, Relators estimate 2,025 hours for claimed physician time in 2012 for codes 99203 - 99213.

35. For each claim reimbursed at 80%, Defendant must have certified either:

    i. that he, rather than a nonphysician assistant, expended approximately 2,025 physician hours on those procedures (see below), or

    ii. that he was *immediately available to furnish assistance and direction throughout the performance of the procedure.* 42 C.F.R. § 410(a)(2).

| Codes | Total Qty | Est. Tran Qty. | time est. minutes | total hours |
|---|---|---|---|---|
| 99201 | 0 | 0 | 10 | 0 |
| 99202 | 425 | 234 | 20 | 78 |
| 99203 | 1,285 | 953 | 30 | 477 |
| 99204 | 0 | 0 | 45 | 0 |
| 99212 | 3,765 | 1,003 | 10 | 167 |
| 99213[4] | 7,453 | 5,214 | 15 | 1,304 |
| | | 7,404 | | 2,025 |

36. Certain other procedures have "objective service time" estimates. [5]

37. For the following procedures, Relators' analysis revealed that nearly all were certified as having been performed by physician or that a physician was "immediately available to furnish assistance and direction throughout the performance of the procedure" because the

---

[4] http://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNMattersArticles/downloads/SE1315.pdf
CPT 99213 - Office or other outpatient visit for the evaluation and management of an established patient. Usually, the presenting problem(s) are of low to moderate severity. Typically, 15 minutes of face-to-face time are spent performing or supervising these services.
[5] These are described in a report prepared for CMS, Development of a Model for the Valuation the Valuation of Work Relative Value Units: Objective Service Time Task Status Report. http://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/PhysicianFeeSched/Downloads/RVUs-Validation-Urban-Interim-Report.pdf

reimbursement ratio approximated 80%. Defendant's ratio of payment amount/allowed amount ranged from 78.8% (procedure 17110, 853 procedures) up to 79.8% (procedure 17003, with 14,472 procedures).

38.     The physician time estimates below are for "intra-service" time, the clinical service time the physician spends performing the service. [6] The estimates are low because they do not include additional physician "post-service" time. Because Defendant Tran is the only physician in the practice these procedures had to have been done by him or supervised by him. Biopsies (codes 11100 and 11101) may not be supervised.

| Code, Description | line svc Count | "Intra" minutes | Total Min. | Total Hours |
|---|---|---|---|---|
| 11100  Biopsy skin, 1 lesion | 7,752 | 12 | 93,024 | 1,550 |
| 11101  Biopsy, additional lesions | 8,635 | 10 | 86,350 | 1,439 |
| subtotal | | | | 2,990 |
| | | | | |
| 17000  Destruct premalg lesion | 5,516 | 3 | 16,548 | 276 |
| 17003  Destruct premalg les 2-14 | 14,472 | 2 | 28,944 | 482 |
| 17004  Destroy premal lesions 15/> | 866 | 20 | 17,320 | 289 |
| 17110  Benign up to 14 lesions | 853 | 7 | 5,971 | 100 |
| subtotal | | | | 1,146 |

39.     Relators' investigation reveals that Defendant claims to perform his own Mohs pathologies and refers out the rest (over 15,000 referrals). [7] *See*, False Claims for Pathology Procedure 88305, below.

---

[6]     Defined at F-5 p. 136 http://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/PhysicianFeeSched/Downloads/RVUs-Validation-Urban-Interim-Report.pdf.

5.1.3 Post-Service Time   Post-service time is the clinical service *time the physician spends* following the completion of the intra-service activity. Post-service activities are those that follow the actual performance of the service itself (e.g., the physician's interaction with the patient in the recovery room, communication with other professionals, post-op care on day of procedure), and will vary depending on the type and location of the service.

[7]     Defendant Tran claimed 19,969 Mohs procedures in 2012.

40.     For code 88305 "Level IV Surgical pathologies, gross and microscopic examination" Defendant claimed they were performed by a physician (or directly supervised) because they are reimbursed at nearly 80% of amount allowed. This adds another purported 8,320 hours to his claimed workload in 2012.

| Code, Description | line svc Count | Intra minutes | Total Min | Hours |
|---|---|---|---|---|
| 88305  Level iv-surgical pathology | 19,969[8] | 25 | 499,225 | 8,320 |

41.     All of this ignores physician post service times and indirect supervision times for other procedures. Besides the 65,467 procedures above, Defendant claims to have expended time either performing or supervising another 18,838 procedures (65,437 subtracted from 85,305 total line service count). Defendant must supervise these claims, even if he did not perform.

42.     To the extent these 18,838 other procedures were supervised, they must have been claimed as supervised directly or indirectly by Defendant.

43.     Relators determined that Defendant could not have expended the estimated 14,481 hours calculated above, plus supervision, plus office management, in a single year. They allege that many of these procedures were performed, if at all, by Defendant's P.A.s and without *direct* supervision.

44.     There could be no "direct supervision" allowing 80% reimbursement because Dr. Tran could not have been *immediately available* to furnish assistance and direction throughout the performance of the simultaneous 11,491 hours' procedures while he was himself performing 2,990 hours of biopsies (in an office open approximately 2,000 hours per year).

45.     Further, the total 992xx (Evaluation / Management or E & M) combined with the

---

[8]     With the addition of Tran's 138 code 88304 path exams, his total exceeds 20,000. But these are not included in the 8,320 hours because Relators could not find the estimated time to conduct these pathologies.

other dermatologic procedures appear to be fraudulently coded. "Medicare will not pay for a separate E & M service on the same day as a dermatologic service unless a documented significant and separately identifiable medical service is rendered."[9]

### B.    False Claims for Biopsy 11100 – 11424

46.    Defendant's staff reported to Relator Green that Defendant's P.A.s perform biopsies, but his Medicare claims show they are paid as if they were claimed to have been performed by a physician.

47.    CPT code 11100 is defined as: "Biopsy of skin, subcutaneous tissue and/or mucous membrane (including simple closure), unless otherwise listed; single lesion." The code is used to bill the first biopsy performed on a patient during a visit. CPT code 11101 is used to bill every additional biopsy performed on the same patient during that visit.

> [D]uring Skin Biopsy (CPT® 11100), the technician or nurse may perform certain elements of pre-service work, such as preparing instruments and taking vital signs, while the physician or physician assistant (PA) will administer anesthesia. *The physician then performs all intra-service work tasks,* i.e., debridement, but a PA applies the dressing.

[emphasis supplied] p. 16, [10] *Development of a Model for the Valuation of Work Relative Value Units, Objective Service Time Task Status Report*, June 30, 2014; Prepared for Centers for Medicare and Medicaid Services [CMS Time Task Report].

48.    The CMS Time Task Report estimates a minimum 12 minutes and 10 minutes respectively for the two biopsy procedures' intra-service work. Id. at 45. This is less than the minimum physician time required because there must be some additional time for the physician's

---

[9]    Removal of Benign or Premalignant Skin Lesions (L27527)
http://www.cms.gov/medicare-coverage-database/details/lcd-details.aspx?LCDId=27527&ContrId=314&ver=78&ContrVer=1&CoverageSelection=Both&ArticleType=All&PolicyType=Final&s=All&CptHcpcsCode=17000&bc=gAAAABAAAAAAAA%3d%3d&

[10]    http://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/PhysicianFeeSched/Downloads/RVUs-Validation-Urban-Interim-Report.pdf

supervision of pre-and post-service for PA "completing the medical record or communicating with primary physician if necessary." *Id.* at 16.

49.     Defendant received reimbursement from the U.S. government for 7,752 code 11100 procedures and 8,635 code 11101 procedures in 2012. Relators' analysis of this information reveals that, if the reporting is accurate, Defendant claimed, in effect, a biopsy practice in 2012 that took more than 2,990 hours for the intra-service work.

| Code | | Line Svc cnt. | unique Benef. | Min. /proc | intra. Time (hours) |
|------|--|------|------|------|------|
| 11100 | Biopsy 1 lesion | 7,752 | 5,376 | 12 | 1,550 |
| 11101 | Biopsy add-on[11] | 8,635 | 3,447 | 10 | 1,439 |
| total | | | | | 2,990 |

50.     Dr. Green opines that it is virtually impossible for Defendant to perform the number of code 11100 and code 11101 procedures he claimed to CMS to have done in 2012. This is especially apparent given the time needed for each procedure and that his office is open only five days a week (and fewer than 2,990 hours per year).

51.     Even if Defendant Tran performed all of the procedures he reported to CMS, his purported claims are out of the norm compared to other providers in the rest of the country. A comparative analysis reveals that the national average for patients that required a second biopsy was 30% while Defendant's percentage was 53%.

52.     It appears unreasonable so many of his patients required second biopsies (11101).

| | National Total | National % | Tran Total | Tran % |
|------|------|------|------|------|
| 11100 | 2,834,165 | 70% | 7,752 | 47% |
| 11101 | 1,239,995 | 30% | 8,635 | 53% |
| | 4,074,160 | | 16,387 | |

---

[11]     "Biopsy of skin, subcutaneous tissue and/or mucous membrane (including simple closure), unless otherwise listed (separate procedure); each separate/additional lesion." p. 37 http://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/PhysicianFeeSched/Downloads/RVUs-Validation-Urban-Interim-Report.pdf

### C.   False Claims for Benign Lesion Excisions (Codes 11400 – 11424)

53.     Medicare reimburses for non-cosmetic excision of benign lesions. The codes identify the location on the body and the size of the lesion.

#### 1.   *464 False Claims for Code 11402 Excisions (Codes 11400-11406)*

54.     Based on Relators' analysis of all providers who billed for excisions under code 11402, Relators ascertained that Defendant filed 464 false claims under that code in 2012.

55.     Codes 11400-11406 cover "all Excision, benign lesion including margins, except skin tag, trunk, arms or legs."[12] The codes cover similar excisions, but the particular code used depends on the size of the excision.

56.     Nationally, CMS reimbursed 3,616 providers for procedures under codes 11400-11406 in 2012. Defendant was CMS's number one in the nation payee for code 11402: excisions between one and 2 cm². He was also the top biller for the aggregated procedures 11400-11406: performing 257 more procedures 11400-11406 that year than the second highest biller of those procedures.

57.     Compared to averages for other providers who billed for codes 11400-11406 in 2012, Defendant is an outlier in billing under code 11402.

| Code | Size | Nat'l Total | Nat'l % | Tran Qty | Tran % | Tran National Rank |
|------|------|-------|------|------|------|------|
| 11400, | .5 cm or less | 9,900 | 9% | 0 | 0% | |
| 11401, | 0.6-1 cm | 33,258 | 31% | 33 | 3% | |
| 11402, | 1.1-2 cm | 46,916 | 44% | 1,095 | 87% | #1 |
| 11403, | 2.1-3 cm | 11,146 | 10% | 114 | 9% | |
| 11404[13], | 3.1-4 cm | 3,088 | 3% | 14 | 1% | |
| 11406, | >4 cm.+ | 1,982 | 2% | 0 | | |
| All 11400-06 | | 106,290 | 100% | 1,256 | | #1 |

---

12     http://www.dermadvocate.net/library/articles/derm-coding.
13     There is no code for 11405.
13     There is no code for 11405.

58.     There is no medical reason to find 87% of lesions to be of one size 1.1-2 cm.

59.     National Medicare reimbursements show that, on average, physicians who perform lesion excisions falling within codes 11400-11406 can expect to bill about 44% of all procedures performed under code 11402. Defendant submitted *twice* the expected number of 11402 claims for reimbursement by the U.S. government.

60.     The surface area of most of Defendant's excisions appear much too large. Typically, one would expect to see about 40% of his patients exhibiting lesions less than 1.1 sq. cm, and billed as codes 11400 and 11401. But for Dr. Tran, a mere 3% of his patients' procedures were coded as less than 1.1 cm.[14]

61.     Defendant upcoded 37% of the procedures that should have been billed as 11400 and 11401 to 11402. Downcoding drops the claimed 87% to 50%, closer to the norm of 44%.

62.     Relators estimate that in 2012 Defendant filed 464 false claims: 37% of 1,256 procedures under code 11402 rather than codes 11400 or 11401.

   **2.     *102 False Claims for Code 11422 Benign Excisions***

63.     Relators estimate that Defendant filed 102 false claims for procedures claimed under code 11422 in 2012. This allegation is based on the following analysis:

64.     Codes 11420 to 11426 are for "Excision, benign lesion including margins, except skin tag (unless listed elsewhere), scalp, neck, hands, feet, genitalia." The particular code used depends on the size of the lesion. In 2012, Defendant collected reimbursement for the 170 excisions performed under code 11422, lesion diameter 1.1 to 2.0 cm. Remarkably, *none* of his Medicare patients had lesions larger or smaller.

65.     Relator Green opines the claims for single size excisions as unreasonable. His

---

[14]     Although Defendant was #1 for 11402, he was #447 of 986 providers who were reimbursed for 11401.

opinion is consistent with actual Medicare reimbursements to other providers for codes 11420 to 11426:

| Code | Size | Ttl. Svc. Cnt | % | Tran Qty | Tran % |
|---|---|---|---|---|---|
| 11420 | .5 cm or less | 9,315 | 31% | 0 | 0% |
| 11421 | 0.6-1 cm | 8,852 | 30% | 0 | 0% |
| 11422 | 1.1-2 cm | 8,723 | 29% | 170 | 100% |
| 11423 | 2.1-3 cm | 2,177 | 7% | 0 | 0% |
| 11424[15] | 3.1-4 cm | 432 | 1% | 0 | 0% |
| 11426 | over 4 cm | 275 | 1% | | |
| Total 11401-406 | | 29,774 | 100% | | |

66.     Assuming Defendant did perform the procedures he claimed to CMS, Dr. Green opines it is highly unlikely that *all* of Defendant's patients came to him with lesions in the 1.1 to 2 centimeter size. Based on figures reported to the government from other medical providers doing the same types of procedures, Defendant would expect to see about 60% of his patients with lesions less than 1.1 sq. cm, and billed as codes 11421 and 11420.

67.     Defendant reported none (0%) as less than 1.1 cm.

68.     Based on his comparisons with other medical providers billing under these codes, Relators believes the likely explanation for the unusual absence of less costly and smaller excisions is that Defendant upcoded 60% of the procedures that should have been billed as 11420 and 11421 to 11422.

69.     Relators estimate Defendant filed 102 false claims (60% of 170) for code 11422 in 2012.

## D.     False Claims for Malignant Lesion Excisions

### 1.     *281 False Claims for Codes 11602 & 11606 Malignant Lesion Excisions*

70.     Relators allege Defendant upcoded 281 malignant lesion excisions. They reached

---

[15]     There is not code for 11425.

this conclusion through the following analysis:

71.    Codes 11600 to 11626 are for "Excision, malignant lesion including margins, trunk, arms, or legs." As with the other code categories discussed above, this particular code category also is distinguished by the size of the lesion. For two of these codes, Defendant received more reimbursements than any other provider in the nation for 2012. For code 11603, CMS reimbursed Defendant for 437 procedures. The nation's second highest biller for this procedure billed Medicare for 294 procedures. Defendant billed 143 more of these procedures in 2012 than the next highest biller.

72.    Indeed, when all procedures in codes 11600 – 11606 are aggregated, Defendant was 2012's top biller in the nation.

73.    Defendant purportedly performed 842 malignant excisions in one year. But unlike the wide distribution of lesion sizes seen by other dermatologists in the country, *all* of Defendant's Medicare patients had lesions roughly the same size: between 1.1 and 3 cm. (billed under codes 11602 and 11603).

74.    Defendant has not accurately reported to the government the correct number and/or percentage of single-size excisions he performed in 2012, and his claims for reimbursement are fraudulent.

| Code | Size | Nat'l. Ttl. | | Tran | | Tran Nat'l. |
|------|------|---------|------|------|------|------|
| | | Svc Cnt | % | Qty. | % | Rank |
| 11600 | .5 cm or less | 887 | >1% | 0 | 0% | |
| 11601 | 0.6-1 cm | 13,442 | 6% | 0 | 0% | |
| 11602 | 1.1-2 cm | 135,572 | 60% | 405 | 48% | #1 |
| 11603 | 2.1-3 cm | 55,372 | 25% | 437 | 52% | #1 |
| 11604[16] | 3.1-4 cm | 9,292 | 4% | 0 | 0% | |
| 11606 | over 4 cm | 225,987 | 100% | | | |

75.    Defendant fraudulently upcoded 281 procedures based on the following analysis:

---

[16]    There is no procedure code for 11605.

Relators estimate that of the 437 procedures reported as performed by Defendant under code 11603 only 25% (206) of these procedures should have actually been coded as 11603. Relators use 25% because that is the national average for all dermatologist practices that made reimbursement claims under code 11603. Consequently, Defendant upcoded approximately 231 procedures. This is the difference between 437 (reported) and 211 (the likely accurate number). In addition, if using the national average, 6% of his 842 procedures should have been coded at 11601. He reported 0. Consequently, 51 of these procedures were upcoded. The combined upcoding in codes 11600- 1160 totals 281 procedures.

|       | Claims | Expected % | Expected # | Estimated Upcodes |
|-------|--------|------------|------------|-------------------|
| 11601 | 0      | 6%         | 50         | 50                |
| 11602 | 405    | 60%        | 505        |                   |
| 11603 | 437    | 25%        | 206        | 231               |
| total | 842    |            | 842        | 281               |

### 2.   19 False Claims for Codes 11622 & 11623 Malignant Lesion Excisions

76.    Codes 11620 to 11626 cover "Excision, malignant lesion including margins, scalp, neck, hands, feet, genitalia." Defendant's coding here paralleled his coding. Assuming the procedures were actually performed, Relators estimate 19 upcodes based on the claims made by other practitioners, and following the same logic applied above.

|       | Nat'l Count | Nat'l % | Tran Count | Expected | upcodes |
|-------|-------------|---------|------------|----------|---------|
| 11620 | 198         | 0%      | 0          |          |         |
| 11621 | 4,452       | 9%      | 0          | 5        | 5       |
| 11622 | 34,259      | 69%     | 37         | 42       |         |
| 11623 | 7,887       | 16%     | 24         | 10       | 14      |
| 11624 | 1,958       | 4%      | 0          | 2        |         |
| 11626 | 863         | 1%      | 0          | 1        |         |
|       |             |         | 61         |          | 19      |

**E.      60 False Claims for Code 13121 "Repair,complex, scalp, arms, and/or legs; 2.6 cm to 7.5 cm**

77.      Defendant upcoded approximately 60 complex repairs, scalp, arm and/or legs in 2012.

78.      CMS paid Defendant for 663 procedures under code 13121. But he performs no procedures for lower-paying code 13120, which is the identical procedure, but for 1.1 cm to 2.5 cm. or for lower-paying code 13122, the procedure for each additional 5 cm.

79.      When comparing and contrasting Dr. Tran's dermatology practice with all other medical providers' reimbursement in 2012, Relators find his numbers are out of line.[17] On this basis, they opine Defendant has not accurately reported the correct number and/or percentage of single-size excisions under code 13121 he performed in 2012, and his claims for reimbursement are fraudulent.

| Code | Size | Nat'l Qty | % | Avg. Allowed | Tran Qty | Expected |
|------|------|-----------|---|--------------|----------|----------|
| 13120 | 1.1 - 2.5 cm | 3,387 | 3% | $241 | 0 | 20 |
| 13121 | 2.6 – 7.5 cm | 101,125 | 91% | 331 | 663 | 603 |
| 13122 | each add'l 5 | 6,182 | 6% | 102 | 0 | 40 |
| Upcodes to more expensive procedures | | | | | | 60 |

**F.      False Claims for 13132  Repair, complex, forehead, cheeks, chin, mouth, neck, axillae, genitalia, hands and/or feet**

80.      Relators estimate Dr. Defendant upcoded from 61 to 73 procedures for codes 13131 to 13133. These all involve "repair, complex, forehead, cheeks, chin, mouth, neck, axillae, genitalia, hands and/or feet."

---

[17]    While a large number of procedures does not itself point to false claims, Relators' analysis also revealed Defendant was the nation's most highly compensated provider for procedure 13121 in 2012. Exhibit A.

81. Similar to the false claims alleged for procedure 13121 above, Defendant claimed only code 13132 procedures (indeed, he was the 10th highest biller in the nation for this procedure). Remarkably, he had no claims for the identical procedures required for larger or smaller areas.

| Code | Description | All | % | Tran |
|------|-------------|-----|---|------|
| 13131 | 1.1 - 2.5 cm | 25,441 | 11% | 0 |
| 13132 | 2.6 - 7.5 cm | 203,509 | 87% | 559 |
| 13133 | each add' 5 cm | 4,987 | 2% | 0 |

| Code | % | Avg. Allowed | Expected Tran | Upcoded |
|------|---|--------------|---------------|---------|
| 13131 | 11% | $234 | 61 | 61 |
| 13132 | 87% | $412 | 486 | |
| 13133 | 2% | $149 | 12 | 12 |
| | Totals | | 559 | 73 |

82. Relators estimate that if these procedures were actually performed, as claimed by Defendant, then using the distribution of claims submitted by other medical providers in 2012, Defendant fraudulently upcoded from 61 to 63 of these procedures.

### G. False Claims for Procedure 14061: Adjacent tissue transfer or rearrangement, eyelids, nose, ears or lips, defect 10 sq. cm. to 30 sq. cm.

83. Code 14061 is an adjacent tissue transfer or rearrangement, eyelids, nose, ears and or lips, 10.1 up to 30 sq. cm. (a minimum of 1.5 sq. inches, up to 4.7 sq. inches). The smallest of these, 10 square centimeters (about 1 ½ inches square), is still a big chunk of eyelid, lip, or nose. See illustration.



1.5" x 1.5"
(on 8.5 x 11 paper)

84. Relators compared Defendant's Medicare reimbursement figures to those of the 3,117 providers who billed one or both of these procedures.

| Code | Size | National Qty | % | Tran Qty | % |
|------|------|-------------|------|----------|------|
| 14060, | under 10 cm | 85,716 | 80% | 90 | 33% |
| 14061 | 10.1 - 30 cm - | 21,252 | 20% | 181 | 67% |
| Total | | | | 271[18] | |

85.     If Defendant's practice mirrored the national average, approximately 80% of his 271 procedures were likely smaller than 10 cm. Consequently, using the expected 80% average, Defendant should have had 217 claims coded at 14060. Because he claimed only 90 code 14060 procedures, the rest (approximately 127) were likely upcoded to 14061.

### H.     False Claims for Mohs Micrographic Surgery, 17311-17314

86.     In 2012, Medicare paid Defendant $1,669,419 for performing 4,832 Mohs procedures. Only two providers in the country exceed those amounts, and they specialize in Mohs.

| Code[19] | Total Qty | % | Tran Qty | Tran % | Tran National Rank |
|------|-----------|------|----------|--------|--------------------|
| 17311 | 583,214 | 51% | 1,681 | 35% | #9 |
| 17312 | 433,368 | 38% | 2,203 | 46% | #5 |
| 17313 | 79349 | 7% | 528 | 11% | #5 |
| 17314 | 38,123 | 3% | 420 | 9% | #9 |
| 17315 | 16,848 | 1% | 0 | | |
| Total 17311-15 | | 100% | 4,832 | 100% | #3 |

---

[18]     Tran's 271 14060 and 14061 procedures place him at #5 nationwide for these two procedures.

[19]     Mohs codes:
17311: first stage, up to 5 tissue blocks
17312:  each additional stage after the first stage, up to 5 tissue blocks.
17313: Mohs micrographic technique, including removal of all gross tumor, surgical excision of tissue specimens, mapping, color coding of specimens, microscopic examination of specimens, microscopic examination of specimens by the surgeon, and histopathologic preparation including routine stain(s), of the trunk, arms, or legs, first stage, up to 5 tissue blocks
17314: each additional stage after the first stage, up to 5 tissue blocks (list separately in addition to code for primary procedure).

87.     Defendant claimed reimbursement for 1,681 code 17311 procedures on 1,139 patients. Of those 95% (1,087 patients) needed an additional stage, procedure code 17312.

88.     This was not medically reasonable. This also leads to the conclusion that some of Defendant's 20,000+ pathology procedures were also fraudulent. *See* Pathology, p. 27.

### I.      14001 - 14301 Adjacent tissue transfer or rearrangement

89.     Codes 14001 to 14301 all involve adjacent tissue transfer or rearrangement. The particular codes depend on the body location and size.

#### 1.      *42 False Claims for Codes 14020-021, scalp, arms and/or legs*

90.     Codes 14020-021 reference scalp, arms and/or legs.

91.     The size of defect Defendant claims to treat is questionably large and suspect. Nationally, 58% of the scalp, arm, leg adjacent tissue transfers are 10 cm² or less, and only 42% are 10.1 up to 30 cm. But Defendant claims 100% of his procedures (72) exceed 10 cm². Assuming his patients are similar to the national norms, 58% of the claimed tissue transfers would be 10 cm or less, and Relators opine 42 of his procedures were upcoded. Moreover, the government reimburses Defendant an additional $193 for each of the larger rearrangements.

| Code | Description | National Count | National % | Tran Count | Tran Reallocated | Estimated False |
|------|-------------|----------------|-----------|------------|------------------|-----------------|
| 14020-021 Scalp, arms and/or legs | | | | | | |
| 14020 | 10 cm[20] or less | 15,579 | 58% | 0 | 42 | |
| 14021 | 10.1 - 30.0 cm | 11,210 | 42% | 72 | 30 | 42 |
| Total | | 26,789 | | 72 | 72 | |

---

[20]     All references to centimeters (cm.) refer to square centimeters (sq. cm.).

**2.**      *202 False Claims for Codes 14040-041, forehead, cheeks, chin, mouth, neck, axillae, genitalia, hands and/or feet.*

92.      Codes 14040-041 reference forehead, cheeks, chin, mouth, neck, axillae, genitalia, hands and/or feet.

93.      Procedure code 14041 involves 10.1 to 30 sq. cm. Given the size of the defect treated, his numbers are questionably high and suspect.

94.      Nationally, Medicare pays for almost twice as many 10 cm or less procedures than the 10.1 to 30 cm. But Defendant claimed more than six of the larger and more highly reimbursed procedures for each one of the 10 cm or less procedures.

95.      This suggests that 202 of these larger and more extensive procedures were likely upcoded.

| Code | Description | National Count | National % | Tran Count | Tran Reallocated | Estimated False |
|------|-------------|----------------|------------|------------|------------------|-----------------|
| 14040 | 10 cm or less | 61,364 | 65% | 51 | 253 | |
| 14041 | 10.1 - 30.0 cm | 32,592 | 35% | 337 | 135 | 202 |
| | | 93,956 | | 388 | 388 | |

**3.**      *127 False Claims for Codes 14060 -14061, adjacent tissue transfer or rearrangement on eyelids, nose, ears and/or lips.*

96.      Codes 14060 -14061 involve adjacent tissue transfer or rearrangement on eyelids, nose, ears and/or lips.

97.      Relators calculated that nationwide only one out of five tissue transfers or rearrangement exceeds 10 cm. But Defendant claimed two out of three of his patients required this procedure.

98.      Based on national averages, Defendant upcoded approximately 127 of these procedures, codes 14060 -061, Eyelids, nose, ears and/or lips

| Code | Description | National Count | National % | Tran Count | Tran Reallocated | Estimated False |
|------|-------------|---------------|-----------|-----------|------------------|-----------------|
| 14060 | 10 cm or less | 85,716 | 80% | 90 | 217 | |
| 14061 | 10.1 - 30.0 cm | 21,252 | 20% | 181 | 54 | 127 |
| | | 106,968 | | 271 | 271 | |

**4.** *Likely False Claims for Codes 14060 -14061, adjacent tissue transfer or rearrangement on eyelids, nose, ears and/or lips.*

99.     Codes 14060 -14061 involve adjacent tissue transfer or rearrangement on eyelids, nose, ears and/or lips. Defendant enjoyed reimbursement for 75 of these major procedures in 2012.

100.     His statistics fall far from the norm when compared to others who perform this procedure and the similar procedure code 14302 "each additional 30.0 sq. cm, or part thereof."

101.     Nationwide, Medicare reimbursed for 29,231 of these procedures. This suggests that about half the patients who required 14301 also required the additional 14302. But not one of Defendant's patients had claim for 14302. This raises the possibility that perhaps many of these had been upcoded to the 30 sq. cm. to 60 sq. cm. procedure from a smaller than 30 cm procedure.

| Code | National Total | Total % | Tran |
|------|---------------|---------|------|
| 14301 | 18,385 | 63% | 75 |
| 14302 | 10,846 | 37% | 0 |
| | 29,231 | | |

**J.     Graft procedures, 15220-15261**

102.     Codes 15200-15261 all involve full thickness graft, free, including direct closure of donor site. Given the office is open only 5 days a week, the 356 claimed grafts would require more than a graft a day.

## K.    17004 - 17260 Destruction of Lesions

103.    Procedure codes 17000-17004 report destructions of premalignant lesions, such as actinic keratosis. They report based on the number of lesions treated, rather than the lesion size. Code 17000 is reported for destruction of the first lesion, and code 17003 is reported for the destruction of each lesion from the second through the fourteenth. Code 17004 is reported as a stand-alone code for destruction of 15 or more premalignant lesions.

104.    Code 17003 must be reported with its parent code 17000. [21]

105.    It is unclear how Defendant could have legitimately claimed nearly triple the number of 17003 procedures compared to 17000 procedures.

|  | | Qty. | $/procedure | Total Pd. |
|---|---|---|---|---|
| 17000 | Destruct premalg lesion | 5,516 | $48 | $264,136 |
| 17003 | Destruct premalg les 2-14 | 14,472 | 6 | 82,988 |
| 17004 | Destroy premal lesions 15/> | 866 | 138 | 119,646 |
| 17110 | Destruct b9 lesion 1-14 | 853 | 85 | 72,206 |
| 17111 | Destruct lesion 15 or more | 20 | 105 | 2,090 |
| 17263 | Destruction of skin lesions | 16 | 149 | 2,389 |
| Totals | | 21,743 | | $543,455 |

106.    The quantity (21,743) of claimed destructions of premalignant lesions during 2012 suggests they were not all reasonable and necessary, or they were not actually performed as reported. "Benign skin lesions are common in the elderly and are frequently removed at the patient's request to improve appearance. *Removal of certain benign skin lesions that do not pose a threat to health or function are considered cosmetic, and as such, are not covered by the Medicare program.*"[22] [emphasis supplied]

---

[21]    https://www.aad.org/dw/monthly/2011/november/destruction-codes-for-pre-malignant-and-malignant-lesions#page1

[22]    Removal of Benign or Premalignant Skin Lesions (L27527) "Removal of certain benign skin lesions that do not pose a threat to health or function is considered cosmetic, and as such, are not covered by the Medicare program. Lesions in sensitive anatomical locations that are not creating problems do not qualify for removal coverage on the basis of location alone. If the

107.    CMS paid for all of these at or near 80% of the average allowed amount, indicating that Defendant claimed all these procedures were all performed or *directly* supervised by a physician. [23]

|  |  | Tran's Avg. Allowed | Tran's Avg. Paid | Allowed / Paid ratio |
|---|---|---|---|---|
| 17000 | Destruct premalg lesion | 61 | 48 | 78.6% |
| 17003 | Destruct premalg les 2-14 | 7 | 6 | 79.8% |
| 17004 | Destroy premal lesions 15/> | 174 | 138 | 79.5% |
| 17110 | Destruct b9 lesion 1-14 | 107 | 85 | 78.8% |
| 17111 | Destruct lesion 15 or more | 131 | 105 | 80.0% |
| 17263 | Destruction of skin lesions | 187 | 149 | 80.0% |

### L.    Biopsies 40490, 67810, and 69100

108.    Defendant claimed 1,420 of these biopsies.

|  |  | Average Allowed | Average Paid | Ratio |
|---|---|---|---|---|
| 40490 | Biopsy of lip | 125 | 100 | 79.8% |
| 67810 | Biopsy of eyelid | 213 | 170 | 79.9% |
| 69100 | Biopsy, external ear | 64 | 51 | 79.6% |

109.    But this is not how Defendant's office works. Relators' investigation discovered that the PAs perform these biopsies.

110.    Relator Green opines these biopsies are an area of concern and questions whether they were all reasonable and necessary. For example, eyelid incisions are a difficult area for dermatologists, but Defendant purported to have performed 320 such incisions.

---

beneficiary wishes one or more of these benign asymptomatic lesions removed for cosmetic purposes, the beneficiary becomes liable for the service rendered." http://www.cms.gov/medicare-coverage-database/details/lcd-details.aspx?LCDId=27527&ContrId=314&ver=78&ContrVer=1&CoverageSelection=Both&ArticleType=All&PolicyType=Final&s=All&CptHcpcsCode=17000&bc=gAAAABAAAAAAA%3d%3d&

[23]    In contrast, Defendant's ratio for code 99202, office/outpatient visit new, is 74.6%, suggesting that of the 425 paid, 234 were claimed to have been performed by a physician and paid at 80% , and the balance, 191, were paid at 68% (85% of 8%).

| Code | Description | Services | National Rank |
|------|-------------|----------|---------------|
| 40490 | Biopsy of lip | 250 | #2 |
| 67810 | Biopsy of eyelid | 320 | #3 |
| 69100 | Biopsy- external ear | 850 | #1 |
| Total | | 1,420 | |

111.     The quantity of biopsies also suggests that in light of his other claimed procedures in 2012, perhaps they were not permed at all.

## M.     False Claims for Pathology Procedure 88305

112.     Relator Dr. Green spoke directly with Defendant Tran's office and they reported that he does his own pathologies for his Mohs procedures and refers the rest to outside physicians, with results obtained in about 2 weeks on average.

113.     Procedure 88305 is a pathology and laboratory code for: Level IV - Surgical pathology, gross and microscopic examination. By virtue of the *19,969* reimbursements in 2012 for procedure 88305, nearly all of which he claimed to have performed himself, Defendant is a *de facto* dermatopathologist.

114.     Among dermatologists, Defendant was reimbursed for more code 88305 procedures than all but 5 other dermatologists. Indeed, in 2012 only 10 *pathologists* nationwide received reimbursements for 20,000 or more 88305s. In addition, CMS shows that Defendant referred 15,949 procedures across the state to a South Florida pathologist, Kimara H Whisenant.

115.     Although a large volume of procedures generally does not, by itself, indicate fraud, the number claimed and referred is so far from the norm as to indicate fraud.

## N.     Codes 99202 – 99205 and 99211-99213

116.     Relators detail the over 2,000 physician hours expended by Defendant on these procedures in 2012. See False Claims: Insufficient Time to Perform and Supervise 84,000 Procedures, above.

117.    Here, as with other procedures, Defendant's frauds are revealed as much by what he did not claim as what he claimed. Comparing him to other dermatologists who submitted these procedures for reimbursement, Relators found that Defendant's numbers fall far outside of the expected norm.

| Code | Total | % | Tran Qty | % |
|------|-------|------|------|------|
| 99201 | 101,581 | 6% | 0 | 0% |
| 99202 | 746,678 | 47% | 425 | 25% |
| 99203 | 747,992 | 47% | 1,285 | 75% |
| Total | 1,596,251 | 100% | 1,710 | |

118.    Although dermatologists' national claims were split evenly between 99202 and 99203, Defendant claimed triple the number of the $82 per claim 99203 compared to the $54 per claim 99202. The table below "downcodes" 430 of his $82 claims. This would have dropped his Medicare payments by $1,000 per month. While not much to some, $1,000 per month was enough in 2012 for a monthly payment on a high-end Mercedes or BMW.

| Code | Rate | Qty Claimed | Paid | Assumed Reallocation | |
|------|------|------|------|------|------|
| 99202 | $54 | 425 | $ 22,950 | 855 | $ 46,170 |
| 99203 | $82 | 1,285 | 105,370 | 855 | 70,110 |
| | | 1,710 | $128,320 | 1,710 | $116,280 |

## II.    Count I: Federal False Claims Act

119.    The allegations in the preceding paragraphs are incorporated by reference.

120.    This is a civil *qui tam* action by Relators, acting on behalf of and in the name of the Government, against Defendant.

121.    Defendant violated the False Claims Act, 31 U.S.C. § 3729 *et seq.*, in that he:

a.    knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval.

b.     knowingly made, used, or caused to be made or used:

(i) false records or statements material to false or fraudulent claims, or to get false or fraudulent claims paid or approved; or

(ii) a false record or statement material to a false or fraudulent claim; and

122.    Pursuant to 31 U.S.C. § 3729 *et seq*, any person who violates the provisions set forth herein, is liable for a civil penalty of not less than $5,500 and not more than $11,000, plus three times the amount of damages which the Government sustains as a result of Defendant's making of false claims as herein above set forth.

123.    Upon information and belief, the Government has paid Defendant's false claims in full.

124.    Defendant has filed or caused to be filed false claims as described above, and it is alleged that his conduct began before Relators' first observation of his conduct, and continues through the present.

125.    As a direct, foreseeable and proximate result of Defendant's conduct in violation of 31 U.S.C. § 3729, the United States has suffered damages in an amount to be determined at trial.

126.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a jury trial.

WHEREFORE, Relators pray for judgment against Defendants as follows:

(a) That judgment be entered in favor of the United States and Relators and against Defendant in the amount of each and every false or fraudulent claim multiplied, as provided by 31 U.S.C. § 3729, plus a civil penalty of not less than Five Thousand Five Hundred and No/100 ($5,500) Dollars, and not more than Eleven Thousand and No/100 ($11,000) Dollars per claim, as provided by 31 U.S.C. § 3729, to the extent such

multiplied penalties shall fairly compensate the United States for losses resulting from the various schemes undertaken by the Defendants, together with penalties for specific claims to be identified at trial after full discovery;

(b) That Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the False Claims Act;

(c) That judgment be granted for the United States and Relators for all violations by the Defendants of the False Claims Act;

(d) That the United States and Relators recover any and all damages available to them as a result of Defendants' stated violations of the False Claims Act;

(f) That judgment be granted for the United States and Relators and against Defendant for any costs, including, but not limited to, court costs, expert fees, and all attorneys' fees incurred by Relators in the prosecution of this case; and

(g) That the United States and Relators be granted such other and further relief as the Court deems just and proper.

Respectfully submitted this 5 day of February, 2015

/s/ Jonathan Kroner
FBN 328677
Law Office Jonathan Kroner
420 Lincoln Road, Suite 248
Miami Beach, Florida 33139-3031
305 310 6046
jk@FloridaFalseClaim.com

Attorney for *Qui Tam* Plaintiff

This Complaint will **not** be served on Defendant until ordered by the Court.